Staples, J.
I fully concur in the opinion of my
brother Christian. It would be an unprofitable consumption of time for me to attempt a repetition of his admirable and exhaustive argument. I shall content myself with presenting some views merely supplementary to what has been so well said by him.
It has been my earnest wish to affirm the constitutionality of the act now under consideration; to find ■some way, if possible, consistent with sound and well established principles of constitutional law, by which the decisions of the Court of Appeals mentioned in that act might be reviewed by this court; not because .1 have any reason to find fault with those decisions, or to distrust the judges who rendered them; but it •seemed to me to be due to all parties concerned, they ■should have an opportunity of bringing their cases before a court of the last resort, constituted and appointed •according to the forms and requirements of the constitution of Virginia. Although the right and the duty of the judiciary to expound legislative enactments and to apply to them constitutional restrictions cannot now be questioned, all concede that the task is. a delicate one; and only to be performed upon the clearest and most convincing grounds.
The consequence of declaring this act unconstitutional may be serious injury to the rights of suitors *80 in. two causes before this court. That is the extent of' the evil suggested. The effect, however, of a contrary • decision will be felt in all classes of society, in unsettling the right of a vast number of persons, and in producing endless litigation and confusion throughout the State.
If we are to hold that the military appointees of the federal government occupying this bench after the admission of Virginia into the Union, were neither judges de jure nor de facto, but mere usurpers without color of right or title, we must so hold with regard to the incumbents of the Circuit and County courts, and indeed, every other person performing the duties of a public office in the State subsequent to the period mentioned.
Where there is a plain usurpation of an office without any show of title, the acts of the intruder will be undoubtedly void, both in relation to individuals and the public. We must therefore pronounce every decree of judges so appointed for the sale of property, null and void; every judgment for the recovery of money, a nullity; every sale made by a sheriff, a trespass; every relinquishment of dower ineffectual; and the imprisonment of every criminal by the sentence of such courts, an illegal confinement. It is undoubtedly true, that this court, in expounding the constitution and laws, cannot yield to the consideration of expediency nor look to the consequences which may flow from its decisions. But it is equally true, as was said by judge Chase, in ex parte Griffin, in the examination of questions of this sort, great attention is properly paid to the argument from inconvenience. A construction which must necessarily occasion great public and* private mischief, must never be preferred to a construction which will occasion neither in so great a degree,, unless the terms of the instrument absolutely require such preference.”
*81 It is insisted, however, that the Legislature has removed the difficulties apprehended, by passing that clause of the Enabling Act which ratifies and confirms the proceedings of all the courts, after the admission of the State, with the single exception of the Court of Appeals.
But if the incumbents of the various judicial offices throughout the State were mere intruders, without color of title, can the Legislature, by subsequent enactment, make them judicial officers? Can it confer authority over persons and things where none existed under the laws then in force ? Can it impart to the unauthorized act of a mere private person the force and sanction of a judicial sentence or decree ? If an individual, without color of right, should undertake to hold a court, empanel a jury, put upon his trial a citizen, and condemn and execute him, such an act would be murder; and no legislative authority, in this or any other country, could be justly invoked to clothe the proceeding with the sanctity of a judicial decision. The Legislature may prescribe rules for the exercise of judicial power. It may dispense with formalities which do not constitute a part of the jurisdiction of the court even after the proceedings have been taken; but it cannot, by retrospective laws, make valid proceedings had in court, which were originally void for the want of jurisdiction over the parties.
If the judgments and decrees of these military tribunals derive their validity from the Enabling Act alone, they are binding on the parties, not because they are judicial sentences, but because they are legislative sentences, under the form and semblance of legislative enactments. The parties hold, not under the decree, but under the statute. If one Legislature may affirm; another may disaffirm. The next Legislature elected under different auspices, animated by wholly different views of public policy, may repeal the Enabling Act, *82 and reopen pontroversies which, the best interests of society require should be considered forever settled. It is impossible to escape these conclusions and these results, when once we establish the proposition that the military appointees in question were mere usurpers— without color of right—and that their official acts have0 no validity other than that imparted to them by statute.
Statutes of the British Parliament have been cited and relied on. The British Parliament is omnipotent in the scale of political and judicial existence, and can mould the constitution at pleasure. “The power and jurisdiction of Parliament (says Sir Edward Coke) is so transcendent and absolute that it cannot be confined, either for persons or causes, within-any bounds.” But in this State the Legislature is restrained by a written constitution, with clear and well-defined boundaries, 'separating the coordinate departments, and fixing their respective powers and jurisdictions. I am satisfied, however, that British history does not furnish an instance in which the Parliament has attempted an act of the kind, or, if attempted, in which it has been sustained by the courts.
It is clear, upon authority and reason, that the military appointees of the Federal government, discharging judicial functions in this State after its admission, were neither judges de jure nor mere intruders; but that they were judges de facto; and their acts and decisions, as such, are as valid and binding upon third persons, and upon the parties, as if made by courts of constitutional authority. These decisions may not be considered authoritative as judicial precedents, but they settle and finally adjudicate the matters in controversy between the parties. Under them vested rights have been acquired; they cannot be impeached in any other court upon grounds that will not equally apply to the decrees and judgments of judges de jure; and *83 for all the ordinary purposes of society these appointees are to be regarded, while in the discharge of their respective functions, as rightful and constitutional officers. The. authorities in support of this proposition are abundant and decisive. It is unnecessary for ine to cite them; that has been fully done by Judge Christian.
If, immediately upon the admission of the State, the Legislature had passed an act or resolution declaring a vacancy in the offices of the judges of the Supreme court, or that the decisions they might make •should not be respected and obeyed; or, indeed, if, before the final adjournment of the court, it had authorized this court to rehear any case decided during that term, such an enactment would not, in my opinion, be ■obnoxious to any constitutional objections. But it happens that, although the court was in session when the State was admitted, and continued in session during the month of February, it does not appear that any action was had on the subject until the 14th February, when a resolution was introduced into the House of Delegates by Mr. Marshall, instructing the Committee for Courts of Justice to ascertain and report by what tenure the then incumbents of the State held their offices. Three days thereafter, the committee, construing the resolution as referring to the judges of the Supreme court alone, reported that they had had the matter under consideration; that, in their opinion, the Hon. H. B. Burnham, one of the. judges of said court, was not lawfully exercising the functions of a judge of the Court of Appeals, but was disqualified, if for no other reason, by holding a military office under the Federal government; that they deemed it inexpedient to express any opinion as to whether or not judges Willoughby and Dorman are lawfully exercising the functions of judges of the Court of Appeals, reserving the right to respond further at some future *84 time, if deemed proper, to so much, of the resolution °f enquiry as refers to judges Willoughby and Dorman And the committee recommended the adoption a res°lution declaring the office of H. B. Burnham vacant. Whether this resolution was adopted does not distinctly appear: it is probable it was not, as judge Burnham immediately thereafter retired from the bench. It does appear, however, that the committee never made any other report, and that neither branch of the Legislature took any further action in regard to-judges Willoughby and Dorman; and these gentlemen continued in the discharge of their judicial duties until the close of the term, which occurred on the 25th day of February, 1870. It will thus be seen that the-Legislature, though fully apprized that these military appointees were holding over and claiming rightfully to act as judges of the Supreme court, declined to take-any action, except as to one of them, or even to intimate an opinion that the others were illegally and improperly assuming the functions of Virginia judges. A stronger tacit permission to the two remaining judges, to continue in the exercise of their-judicial functions, could not be given by the General Assembly1 of Virginia. It was so understood by the judges themselves, by parties having cases before the court, and by the public generally. This was true, not merely with-reference to the judges of the Supreme court, but with reference to all the military appointees, throughout the State. The salus populi, the peace and good order of society, the protection of public and private interests, required their continuance in office until proper successors could be legally appointed or elected and qualified. The public voice generally approved the policy, and in most of the counties, judges and justices held their respective courts, rendered decrees and judgments, ordered sales of property, issued executions, convicted and imprisoned offenders, and did all. *85 ■such acts and exercised such functions as rightful •courts may perform. Every consideration of a sound and •enlightened public policy requires- that we should attach to the acts and judicial decisions of these officers, the faith and verity due to all courts of record, until reviewed and reversed in the mode prescribed by the general laws applying to such cases.
The same rules and principles of construction must .apply to the judges of the Supreme Court of Appeals, That court, having adjourned without action by the Legislature, and there being no general laws prescribed for rehearing or renewing the decrees and judgments •of such court after the term is ended, the parties interested in them acquired thereby vested rights, of which they cannot be divested by special enactments of a retrospective character. That it is not constitutionally competent for the legislative department, by retroactive laws, to authorize courts to rehear adjudicated cases, is well settled by numerous decisions. To use the language of an eminent writer, “ If the Legislature cannot indirectly control the acts of the courts by •requiring of them a construction of the law according to its own views, it is very plain it cannot do so ■directly, by setting aside their judgments, compelling them to grant new trials, ordering the discharge of offenders, or directing what particular steps shall be taken in the progress of a judicial inquiry.” Cooley’s •Constitutional Limitations, p. 95.
In this State there are limitations upon the powers of the Legislature, in addition to those contained in positive restrictive clauses of the constitution. These limitations result from the division of powers among •the several departments—legislative, executive and judicial. It was never intended that either should perform an act within the constitutional province of the other. As the judiciary cannot legislate, so neither ■can the legislative department do any act of a judicial *86 nature. Such an act is as clearly a violation of the spirit of the constitution as though that instrument had declared, in express terms, that the legislature-shall nothin any case, exercise judicial powers. And so it is well settled, that a statute empowering a court to review the decisions of another court, in cases not Prided for by the general laws on the subject, is legislation of a judicial character, and directly infringes upon the peculiar and appropriate functions of the judiciary- The reason is obvious. A judicial act is a determination of the existing law in regard to something already done. A legislative act is a rule presented for the regulation of future controversies controlled by its provisions. It has been decided, in numerous cases, that a statute granting or authorizing courts to grant a new trial, is in the nature of a judicial sentence or decree, retrospective in its operation, taking away vested rights, and therefore null and void. And so an act granting a right of appeal where it had been lost by lapse of time, is, for the same reason, unconstitutional and void.
In Burch v. Newberry, 10 N. York R. 374, the Court of Appeals, in discussing a statute of the kind says, “ Thus situated, the Legislature interfered, not to prescribe a rule for all future cases, but to provide a new remedy for the benefit' of a class of persons to obtain a rehearing by appeal, in suits in which decrees had been made and become final against them, where the right to a rehearing at the time not only existed, but had been previously and intentionally abandoned, and thereby not only to impose upon the party in whose favor the decree was made, the expense and inconvenience of another hearing, but to subject all his rights and claims in the matters in controversy, which had been determined and become vested and absolutely fixed by the law then in force, to the uncertainty of future litigation, to be lost or saved, as accident and opinion might *87 afterwards happen to injure or befriend, him. Chancellor Kent, in 1 Kent Com. page 455, declares that a retrospective statute affecting and changing vested rights, is very generally considered in this country as founded on unconstitutional principles, and consequently inoperative and void.” It is useless to multiply authorities upon this point. They are well known to the profession and to the courts, and almost universally recognized and approved in every country under the direction and control of an enlightened jurisprudence.
The principles settled by all the cases, apply with as much reason to the decisions of de facto judges, as to judges holding by unquestioned title under legal and valid appointments. The reasons apply as strongly in the one case as in the other. There can be, in the nature of things, no substantial distinction. In either case the statute is retroactive in its operation; and takes away vested rights; and vacates decrees and judgments which, but for such enactment, could never be impeached. In the examination of decrees and judgments of courts, where the tribunal has jurisdiction over the parties and the subject matter, no enquiry into the title of the judge is ever permitted, further than to ascertain that he is not a mere intruder, but acting under color of a legal appointment. That being ascertained, the validity of the decree or judgment in question is vested and settled by the rules and principles applicable to the sentences of any other judicial tribunal. In Blackwell on Tax Titles, it is said that neither the title of an officer de facto, nor" the validity of his acts as such, can be' indirectly called in question in a proceeding in which he is not a party. The effect of this rule is to render the acts of an officer de facto as valid and effectual as though he was an officer de jure. The interests of the community imperatively require the adoption of such a rule.” The only appropriate *88 mode of testing Ms title is by an information in tbe nature of a writ of quo warrauto, in wbicb, after notice - and an impartial hearing, be will be ousted from tbe office, if it turn out that be bas been exercising official functions without tbe warrant of law. Until then be bolds tbe office by tbe sufferance of tbe State; and tbe silence of tbe government is construed by tbe courts as a ratification of Ms acts; wbicb is equivalent to a precedent authority.” At tbe time of tbe enactment of tbe proviso now under consideration, tbe court having adjourned and tbe term ended, tbe parties in whose favor tbe decisions were rendered bad obtained decrees or judgments wbicb were final in their character—a complete adjudication of tbe matters in controversy. Their title to tbe property or money adjudged them was indefeasible, and could not be impeached by any laws then in force. Tbe effect of tbe proviso is to vacate those decrees or judgments; to reopen them for a reconsideration and adjudication, upon tbe merits, by this court; and “to,subject all their rights and claims in tbe matters in controversy to tbe uncertainty of future litigation, to be lost or saved as accident and opinion might afterwards happen to injure or befriend them.”
Whatever may be said of the decisions sought to be reviewed, it is far better they should be considered and treated as final adjudications of tbe matters in controversy, than that they should be opened by tbe exercise of doubtful, if not dangerous powers. It is better for us all; better for tbe repose of society, tbe protection of property and the happiness of tbe people, that all tbe vast and varied controversies growing out of tbe bloody struggle in wdiich we were involved, shall be adj usted as speedily as possible, and pass forever from tbe arena of political and judicial discussion.